GEER, Judge.
Plaintiff Gloria Fields, on her own behalf and as administrator of the estate of her late husband Phillip McDonald Fields, appeals from an order granting partial summary judgment entered in favor of defendants and from a judgment entered, following trial, in plaintiff's favor in the amount of $1,567.75. Phillip was injured in an automobile accident caused by the negligence of defendant Esther Q. Fields.
On appeal, plaintiff first argues that the trial court erred by granting defendant's motion for summary judgment on the issue whether the accident caused Phillip to suffer a stroke. However, the expert testimony plaintiff relies upon raises only a possibility of causation and, under controlling authority, is insufficient to meet plaintiff's burden of proving causation. The trial court, therefore, properly granted partial summary judgment to defendants on that issue.
In her second argument on appeal, plaintiff argues that the trial court erred in failing to instruct the jury that plaintiff could recover damages for partial loss of use of Phillip's left knee. Because we find that plaintiff presented sufficient evidence to support a reasonable inference that Phillip lost the partial use of his knee because of the accident, we grant a partial new trial on damages.
Facts
Plaintiff's evidence tended to show the following facts. While Phillip was living, Gloria and he lived in Maple Hill, North Carolina. Gloria was the pastor at Maple Hill African Methodist Episcopal Church ("Maple Hill AME"). Phillip, who was an Air Force veteran, worked as a shipping and receiving supervisor at LL Building Products, a company that does ventilation and duct work for heating and air conditioning systems. Phillip was known to be energetic and rarely complained of anything. However, he also had a 20-year history of untreated hypertension that Phillip's physician at Coastal Family Medicine Center, Dr. Albert Meyer, had noted prior to 2005.
On Saturday, 11 June 2005, defendant Esther Fields[1] was driving a GMC Suburban and negligently rear-ended a pickup truck driven by Phillip. Phillip's vehicle was already stopped, and Esther was traveling about 60 m.p.h. just before the collision. The impact broke the windows and seat in Phillip's truck, twisted the dashboard, and partially separated the cab from the body of the truck, although the truck's airbag did not deploy. The impact caused Phillip's knees to hit the dashboard hard, ripping Phillip's pant leg just below his left knee.
Following the accident, Phillip went to the emergency room at Pender County Memorial Hospital, complaining of pain in his head, neck, and back, as well as swelling, pain, and limited range of motion in his left knee. Phillip had an X-ray taken of his left knee, and the emergency department doctor diagnosed Phillip with degenerative arthritis and osteophytes in that knee. Phillip was released that same day with further diagnoses of a lumbar sprain or strain and hypertension. The following Monday, Phillip returned to work. He complained of soreness from the accident, and he continued to experience pain and swelling in his left knee.
Following the accident, Phillip's friends and family noticed changes in him. Gloria observed that Phillip's legs were not as strong as they used to be, and the Sunday following the accident, Phillip went upstairs into the Maple Hill AME building, but he had difficulty coming back down. Phillip's daughter Angela noticed that Phillip had developed a limp and was generally weaker. His other daughter Ebony similarly thought that Phillip was less energetic. Joann Pickett, a member at Maple Hill AME, observed that Phillip was consistently unsteady on his feet when reading Scripture from the pulpit and that he required assistance to stand at the pulpit and to ascend and descend the stairs to the pulpit. According to one of Phillip's coworkers, Phillip's hands had become unsteady, and multiple times Phillip dropped his clipboard and coffee.
On 5 July 2005, Phillip saw Dr. Slade A. Suchecki at Coastal Family Medicine Center. Dr. Suchecki noted that Phillip had worsening pain, swelling, and limited range of motion in his left knee, as well as pain in his neck and shoulder. Dr. Suchecki also noted Phillip's hypertension. Dr. Suchecki referred Phillip to an orthopedist for treatment of his left knee condition, but on 18 July 2005, 37 days after the accident, Phillip suffered a massive ischemic stroke that left him without the ability to walk or speak. The stroke affected motor movement on Phillip's right side only. On 22 July 2005, at a consultation appointment for treatment regarding his stroke, Phillip indicated that he was experiencing continuing pain in his left knee.
Following the stroke, Gloria became Phillip's primary caregiver, and Gloria kept Dr. Meyer apprised of Phillip's condition. For about three years following the stroke, Phillip underwent physical therapy, and Gloria worked with Phillip to get him strong enough to stand up and use a walker. In doing so, Gloria developed a way of assisting Phillip in ambulating. Phillip would wear a knee brace on his right leg to help stabilize it and Gloria would support Phillip's right side while Phillip would hold onto a rail with his left hand and try to walk using his left leg. However, in doing this, Phillip collapsed several times because he did not have any strength in his left leg. Ultimately, Phillip could not use a walker and, except for getting into and out of bed, he was confined to a wheelchair. Because of the stroke, Phillip never sought treatment for his left knee.
On 3 March 2011, Ebony was appointed guardian ad litem for Phillip. Also on 3 March 2011, Gloria and Ebony filed a complaint in New Hanover County Superior Court against Esther and her husband, Derek Fields, alleging that Esther was liable to Phillip for permanent and disabling injuries, for loss of the value of his life, for medical expenses and for lost wages.[2]
On 16 June 2012, Phillip died from colon cancer, unrelated to the accident. Subsequently, Gloria qualified as administrator of Phillip's estate and the trial court substituted Gloria, as the real party in interest as personal representative of Phillip's estate, for Ebony.
In preparation for trial, the parties deposed Dr. James Coin on 14 September 2012 regarding the cause of Phillip's stroke. In that deposition, Dr. Coin expressed his opinion that the accident had nothing to do with the stroke. The parties then deposed Dr. Meyer on 20 November 2012 who had written a letter on 25 February 2010 ("February 2010 letter"), at Gloria's request, suggesting that the accident was a cause of Phillip's stroke. Following the depositions, on 27 February 2013, Esther and Derek moved for partial summary judgment on the issue whether Phillip's stroke was caused by the accident. The trial court granted the motion for partial summary judgment on 26 April 2013. On 4 April 2014, Gloria voluntarily dismissed Derek as a party to the lawsuit without prejudice.
At trial, the trial court read to the jury a stipulation that although there would be testimony and other evidence referencing Phillip's stroke, "the plaintiffs will not seek to recover in this trial any damages relating to a stroke." Dr. Meyer testified regarding Phillip's medical history and condition after the accident and stroke, but he did not testify as to the cause of Phillip's stroke. Plaintiff introduced some of Phillip's medical records, the accident report, and medical bills, and the jury heard testimony from Gloria, Ebony, Angela, Ms. Pickett, and Phillip's coworker. Further, Esther testified as a plaintiff's witness. Defendant presented no evidence.
At the close of evidence, defendant moved for a directed verdict on plaintiff's claim for permanent injury, which plaintiff did not contest and the trial court allowed. The trial court, however, denied defendant's motion for a directed verdict on the issue of causation of the injuries to Phillip's neck, back, and knee.
At the charge conference, plaintiff requested the pattern jury instruction for damages pertaining to the loss of use of a body part, arguing that the evidence permitted the jury to find that Phillip had sustained loss of use of his left knee. The trial court denied this request and instructed the jury that the only damages it could consider with respect to Phillip's injuries were medical expenses and pain and suffering. With respect to Gloria's loss of consortium claim, the trial court instructed the jury that it could consider nominal or actual damages.
The trial court submitted three issues to the jury: (1) whether Esther's negligence injured Phillip; (2) what amount, if any, Gloria, as administrator of Phillip's estate, was entitled to receive on account of Phillip's injuries; and (3) what amount, if any, Gloria was entitled to receive for loss of consortium. The jury returned a verdict finding Esther liable for Phillip's injuries, resulting in $1,567.75 in damages, but also finding that Gloria was not entitled to recover for loss of consortium. Gloria timely appealed to this Court.
I
Plaintiff first argues that the trial court erred in granting partial summary judgment on the issue whether the accident proximately caused Phillip's stroke. "Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " In re Will of Jones,362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting Forbis v. Neal,361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007) ). Summary judgment is appropriate
when the pleadings, together with depositions, interrogatories, admissions on file, and supporting affidavits show that there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law.
Stafford v. Cnty. of Bladen,163 N.C.App. 149, 151, 592 S.E.2d 711, 713 (2004).
"An essential element" of plaintiff's claim is that the accident was a proximate cause of the stroke with proximate cause being defined as " 'a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred[.]' " Self v. Yelton,201 N.C.App. 653, 659, 688 S.E.2d 34, 38 (2010) (quoting Hairston v. Alexander Tank & Equip. Co.,310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984) ). When a plaintiff seeks to recover for an injury allegedly caused by a defendant's tortious conduct, "before holding a defendant liable for an injury to a plaintiff, it must be shown that defendant's actions were 'a substantial factor ... of the particularinjuries for which plaintiff seeks recovery.' " Id.(quoting Brown v. Neal,283 N.C. 604, 611, 197 S.E.2d 505, 509 (1973) ).
It is well established that "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). With regard to whether competent medical evidence supports a determination of proximate cause, our Supreme Court has explained:
Prior to 1983, an expert was not allowed to testify on causation "with outright certainty since that would supposedly invade the 'province of the jury.' " Cherry v. Harrell,84 N.C.App. 598, 603, 353 S.E.2d 433, 436, disc. rev. denied,320 N.C. 167, 358 S .E.2d 49 (1987) ; see alsoN.C.G.S. § 8C-1, Rule 704 (2001) (not changed since its adoption in 1983). Therefore, medical experts were asked only whether " 'a particular event or condition couldor mighthave produced the result in question, not whether it did produce such result.' " Lockwood v. McCaskill,262 N.C. 663, 668, 138 S.E.2d 541, 545 (1964) (quoting Stansbury, North Carolina Evidence§ 137, at 332 (2d ed.1963)). With the adoption of Rule 704 in 1983, experts were allowed to testify more definitively as to causation. N.C.G.S. § 8C-1, Rule 704. While the "could" or "might" question format circumvented the admissibility problem, it led to confusion that such testimony was sufficient to prove causation. See Alva v. Charlotte Mecklenburg Hosp. Auth.,118 N.C.App. 76, 80-81, 453 S.E.2d 871, 874 (1995) (a case that erroneously relied on Lockwood,an opinion on the admissibilityof expert opinion testimony, to find "could" or "might" testimony sufficientto prove causation). Although expert testimony as to the possiblecause of a medical condition is admissible if helpful to the jury, Cherry,84 N.C.App. at 604-05, 353 S.E.2d at 437, it is insufficient to prove causation, particularly "when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation," Young[v. Hickory Bus. Furniture,] 353 N.C. [227,] 233, 538 S.E.2d [912,] 916 [ (2000) ].
Holley v. ACTS, Inc.,357 N.C. 228, 232-33, 581 S.E.2d 750, 753 (2003). Thus, based on Holley, while medical testimony that an event or condition "could" or "might" have caused an injury may be admissible, it is not sufficient to establish causation.
There is no dispute that expert medical testimony was required to establish proximate causation between the accident and Phillip's stroke. The only expert medical testimony plaintiff proffered in opposing the motion for partial summary judgment was Dr. Meyer's February 2010 letter and his deposition. Plaintiff contends that this evidence was sufficient to meet plaintiff's burden of showing causation with respect to the stroke.
Dr. Meyer wrote in his February 2010 letter that "[d]espite having several risk factors unrelated to the crash that contributed to the stroke, it is my professional opinion that the post-traumatic stress brought on by the accident contributed to his Acute Cerebrovascular accident." However, in his deposition, Dr. Meyer never testified that the accident was a probable cause of the stroke. Instead, Dr. Meyer testified: "I think that I could say that [the accident] possibly contributed, but, you know, I don't know." Dr. Meyer repeated similar testimony multiple times throughout his deposition that the accident "could have contributed" to Phillip's stroke or that there was a "possibility" that the accident caused the stroke. Although he also testified that the accident "[p]robably [had] a little to do with [the stroke ]," he explained that this opinion was based on the fact that "to the extent that stress, pain, and other medications can jack up blood pressure, I think [the accident] could have contributed or hastened [the stroke ] ."
Regarding his opinion in the February 2010 letter that the accident "contributed" to the stroke, Dr. Meyer clarified what he meant by this in his deposition: "I was asked if it could have contributed, and all I said was, it could have contributed. You know, that's all I said.... I think what I was responding to when I wrote the letter was [Gloria] or her representative asking me if [the accident] could have contributed, and I responded, possibly could have contributed." Further, Dr. Meyer testified, "[C]ould [the accident] contribute? I had said in [the] previous letter, possibly, you know, but I don't know." Dr. Meyer also added, "Did [the accident] cause his stroke? I can't say that[,]" and "I don't think the accident caused [Phillip] to have a stroke."
In sum, Dr. Meyer's deposition is replete with statements amounting to nothing more than that the accident "could" have caused Phillip's stroke, which is insufficient to establish that the accident was a proximate cause of Phillip's stroke. See Lord v. Beerman,191 N.C.App. 290, 300, 664 S.E.2d 331, 338 (2008) ("We hold that Plaintiff's evidence was insufficient to establish the requisite causal connection between Defendants' alleged negligence and Plaintiff's blindness. Neither of Plaintiff's expert witnesses were able to testify that Plaintiff's vision would be better today had Defendants initiated steroid treatment sooner, nor were they able to testify that Plaintiff's vision probablywould be better .").
Plaintiff nonetheless contends that the evidence she forecast at the summary judgment hearing was sufficient to support the claim of damages for Phillip's stroke because it is like the evidence that was found sufficient in Mann v. Va. Dare Transp. Co.,283 N.C. 734, 198 S.E.2d 558 (1973), Lockwood, Kennedy v. Martin Marietta Chems.,34 N.C.App. 177, 237 S.E.2d 542 (1977), and Felts v. Liberty Emergency Serv., P.A.,97 N.C.App. 381, 388 S.E.2d 619 (1990). Mannis irrelevant to this case because it does not deal with medical causation. With respect to Lockwood,our Supreme Court in Holleynoted that Lockwoodwas "an opinion on the admissibilityof expert opinion testimony," and does not support a conclusion that " 'could' or 'might' testimony [is] sufficientto prove causation." 357 N.C. at 233, 581 S.E.2d at 753. We are, of course, bound by the Supreme Court's construction of Lockwood,and Lockwood,therefore, cannot establish that plaintiff's evidence is sufficient to establish causation.
In Kennedy,the decedent, who died of a heart attack while working, had a history of "a rather severe coronary heart disease with several years of plaque formation in the main coronary vessels[,]" and there was evidence of a previous heart attack. 34 N .C.App. at 178, 237 S.E.2d at 543. An expert witness testified that " 'the heart attack [that caused decedent's death] could or might have been brought about by deprived or reduced oxygen supply.' " Id.There was further evidence that shortly before his death the decedent began breathing heavily and, from the autopsy, that his lungs were a reddish color, both indications that the decedent could have had a low oxygen supply. Id.at 182, 237 S.E.2d at 545. Further, the medical expert testified that " '[w]ith the degree of heart disease that [the decedent] had ... [he] would be in a certain precarious state if he were in a situation of decreased oxygen supply. It would certainly be, could be a stress situation for him, and it would lead to essentially a heart attack at some point because of this decreased oxygen with his impaired coronary circulation to the heart.' " Id.This evidence allowed the Industrial Commission to "reasonably infer that the diminished oxygen supply, combined with decedent's ... heart disease, caused the fatal heart attack." Id.,237 S.E.2d at 54546. Here, Dr. Meyer did not testify that the accident essentially led to Phillip's stroke.
In Felts,the plaintiff's expert witness testified: " 'It's possible that the [plaintiff's] heart attack could have been prevented if he had been admitted ... to the hospital.' " 97 N.C.App. at 388, 388 S.E.2d at 623. Although this Court noted that the expert's testimony would, standing alone, only indicate a mere possibility of causation, the Court held that because the expert gave a "detailed explanation of how admission to a hospital ... could have prevented plaintiff's heart attack[,]" the testimony "establishe[d] more than a minimal 'showing that different treatment would have improved [his] chances of recovery.' Plaintiffs' evidence ... tended to show that defendants' failure to hospitalize and failure to more thoroughly diagnose plaintiff's condition contributed to his myocardial infarction and its severity." Id.at 389, 390, 388 S.E.2d at 623, 624 (emphasis added).
However, in holding that expert testimony in Feltswas sufficient to establish proximate cause, this Court reasoned that "[o]ur case bears a resemblance to the facts in Lockwood...." Id.at 389, 388 S.E.2d at 623. Yet, the Supreme Court in Holleyheld that Lockwoodhad been erroneously relied upon as a case dealing with the sufficiency of evidence of proximate cause, rather than the admissibility of expert testimony relevant to the issue of proximate cause. To the extent that Feltsconflicts with Holley, Holleycontrols. See State v. Mills,--- N.C.App. ----, ----, 754 S.E.2d 674, 678 ("[W]e are bound by the decisions of our Supreme Court[.]"), disc. review denied,367 N .C. 517, 762 S.E.2d 210 (2014).
Moreover, Dr. Meyer testified equivocally about the significance of the accident in relation to the other risk factors of the stroke: "[T]o the extent that that event contributed to the overall stroke ..., I think it was a contributing factor, but I can't say with any degree of certaintywhere it ranks in the list of things that caused him to have a stroke." (Emphasis added.) Dr. Meyer's testimony that the accident could have contributed to the stroke was based on the assumption that the accident could have elevated Phillip's blood pressure, although Dr. Meyer admitted that Phillip had "uncontrollable high blood pressure " for about 20 years before the accident and that it was speculative that Phillip's blood pressure was elevated higher than usual because of the accident. Thus, insofar as Dr. Meyer's deposition testimony could be construed as similar to the testimony in Feltsas providing some explanation of how not being involved in the accident could have avoided the stroke, the testimony is speculative.
Consequently, while plaintiff presented admissible evidence of causation, under Holley,that evidence was not sufficient to give rise to a genuine issue of material fact regarding whether the accident was a proximate cause of Phillip's stroke. We, therefore, uphold the trial court's grant of partial summary judgment in defendant's favor.
II
Plaintiff next argues that the trial court erred in denying her request for a jury instruction on damages from the loss of use of Phillip's left knee or leg. "To prevail on the issue of whether her requested instructions should have been given to the jury, plaintiff must demonstrate that: '(1) the requested instruction was a correct statement of the law, and (2) was supported by the evidence, and that (3) the instruction given, considered in its entirety, failed to encompass the substance of the law requested, and (4) such failure likely misled the jury.' " Osetek v. Jeremiah,174 N.C.App. 438, 440, 621 S.E.2d 202, 204 (2005) (quoting Liborio v. King,150 N.C.App. 531, 534, 564 S.E.2d 272, 274 (2002) ), aff'd per curiam,360 N.C. 471, 628 S.E.2d 760 (2006).
Counsel for plaintiff requested the following pattern jury instruction at trial:
Damages for personal injury also include fair compensation for the (partial) loss of (use of) (identify part of body affected) experienced by the plaintiff as a proximate result of the negligence of the defendant. There is no fixed formula for placing a value on the (partial) loss (of use) of part of the body. You must determine what is fair compensation by applying logic and common sense to the evidence. You may consider:
[the extent of any [past] [present] [future] disability or handicap proximately caused by the negligence of the defendant]
[any [past] [present] [future] inconvenience or hardship proximately caused by the negligence of the defendant]
[ (specify any other factor supported by the evidence) ].
However, the plaintiff is not entitled to recover twice for the same element of damages. Therefore, you should not include any amount you have already allowed for [loss of earnings] [pain and suffering] [scarring or disfigurement] because of the (partial) loss of (use of) (identify part of body affected).
N.C.P.I.-Civ. 106.12 (motor veh. vol.2013) (internal footnotes omitted). There is no dispute that the requested instruction is a correct statement of law.
Plaintiff contends that there was sufficient evidence to support the trial court's giving the requested instruction on Phillip's loss of use of his left leg or knee. At the charge conference, the trial court acknowledged that for the time period between the accident and the stroke, "there was some testimony regarding his difficulty walking, his difficulty standing up and sitting down" but "[o]nce you get past that, I'm not sure what to do with that when it comes to dealing with partial loss."
As this Court has explained:
[A] tortfeasor is responsible for all damages directly caused by his misconduct, and for all indirect or consequential damages which are the natural and probable effect of the wrong, under the facts as they exist at the time the same is committed and which can be ascertained with a reasonable degree of certainty. However, [d]amages which are uncertain and speculative ... are too remote to be recoverable.
Watts v. N.C. Dep't of Env't & Natural Res.,182 N.C.App. 178, 185-86, 641 S.E.2d 811, 818 (2007) (internal citations and quotation marks omitted), aff'd in part as modified, 362 N.C. 497, 666 S.E.2d 752 (2008).
As an initial matter, we address whether plaintiff presented sufficient evidence that the accident was a proximate cause of injury to Phillip's left knee. The undisputed evidence shows that during the accident, Phillip's knees struck the dashboard during the collision and his left pant leg was torn below his knee. Following the accident, Phillip had swelling in his left knee and complained of pain and limited range of motion in that knee. Gloria testified that Phillip was not usually one to "complain[ ] about much of anything" although she could tell Phillip was in pain after the accident. An assessment of Phillip after the accident described Phillip's knee pain as " 'new.' " Three weeks after the accident, when Phillip saw Dr. Suchecki, Phillip complained of worsening knee pain, increased swelling, and decreased range of motion. Further, after the stroke, Phillip was "grimacing and touching his left knee ."
Dr. Meyer testified that when a radiologist reviewed Phillip's X-ray, the radiologist noticed that, in addition to Phillip's arthritis and osteophytes, there was an "effusion" or swelling as well as a "questionable loose body in the intercondylar notch" of the knee. Dr. Meyer explained that Phillip's arthritis was "a consequence of the aging process" and the "swelling in his knee joint ... doesn't occur usually with degenerative arthritis [but] can occur with some kind of traumatic injury" to the joint. Dr. Meyer stated that he could "safely say" that the accident "had something to do with [Phillip's] knee pain." Dr. Meyer testified that he had no evidence of a prior traumatic event to Phillip's knee, and Gloria testified that prior to the accident Phillip never sought treatment for any traumatic injury to his left knee.
Although defendant points to the fact that the emergency department doctor did not diagnose Phillip with a traumatic injury at the hospital, Dr. Meyer explained that this is because "my experience is that emergency room doctors are pretty good at picking up things like fractures and obvious problems that need immediate attention, but joint effusions are a little bit harder to pick up." The evidence before the trial court would have supported a determination that Phillip's knee injury was the proximate result of the accident. See Smith v. Pass,95 N.C.App. 243, 252, 382 S.E.2d 781, 787 (1989) (holding plaintiff provided sufficient evidence that thoracic fracture was proximately caused by car collision where medical expert testified that fracture "originally undiagnosed by doctors immediately after the accident, was caused by the collision in question"). See also Goble v. Helms,64 N.C.App. 439, 448, 307 S.E.2d 807, 814 (1983) (holding sufficient evidence of causal connection between collision and numbness on left side of plaintiff's body, weakness in left hand, and pain in neck despite lack of medical evidence, where "[p]laintiff[ ] testified that he had not experienced these conditions before the collision, and that he had since").
Regarding the evidence concerning the loss of use of Phillip's left leg, Ms. Pickett testified that after the accident she saw Phillip limping out of the hospital with his left pant leg torn. Ms. Pickett also testified that the second Sunday after the accident and the following Sundays until his stroke, she noticed that someone had to help stabilize Phillip as he read from the pulpit because he appeared unsteady on his feet, and he was unable to manage the stairs leading up to the pulpit. According to Ms. Pickett, this was unusual. Angela testified that upon seeing her parents at the airport after the accident, the first thing she noticed about Phillip was that he had a limp and that this was unusual.
Further, according to Gloria's testimony, only Phillip's right side was affected by the stroke. Although Gloria used a brace to stabilize Phillip's right leg as she tried to help him ambulate, Phillip suffered a number of collapses. Gloria perceived these falls to be due to weakness in his left knee, and, ultimately, Phillip was bound to a wheelchair. Given Gloria's testimony and observations, we hold that the jury could have reasonably concluded that Phillip continued to suffer from a loss of use of his left leg after the stroke.
Although defendant suggests that Gloria's testimony that Phillip's left leg was too weak was speculative, as Phillip's constant caretaker, her observations were competent because she was in a position to observe Phillip's falls. See Goble,64 N.C.App. at 448, 307 S.E.2d at 814 (noting as competent evidence supporting loss of use instruction that "[s]everal witnesses testified to [plaintiff's] physical strength before and after the collision, indicating a diminution therein"). As such, any challenge to her testimony went to the weight of it, which was for the jury to determine. See Smith v. White,213 N.C.App. 189, 193, 712 S.E.2d 717, 720 (2011) (" '[T]he weight of evidence is for the jury, while the admissibility of evidence is for the court.' " (quoting U.S. Fid. & Guar. Co. v. P. & F. Motor Express, Inc.,220 N.C. 721, 723, 18 S.E.2d 116, 117 (1942) )).
We hold that plaintiff's evidence was sufficient to allow the jury to find that Phillip suffered at least a partial loss of use of his left leg or knee as a result of the accident. See Collins v. Nat'l Healthcare of Leesville, Inc.,101 So.3d 1110, 1121 (La.App.2012) ("We ... find that the jury erred in failing to make any award for loss of use of his arm and loss of enjoyment of life. Clearly, [plaintiff] could not use his arm for a year and a half. He also still has difficulties with every day events.").
Plaintiff further contends that the jury was confused by the damages instruction. The instruction here only charged the jury with respect to damages relating to Phillip's medical expenses and his pain and suffering. Loss of use of a body part is an element of damages distinct from damages for medical expenses and pain and suffering. See Drozdov v. Webster,345 A.2d 895, 897 (Del.1975) (holding plaintiff could not recover for loss of use where "injury cause[d] numbness and pain, but ... not ... motor function loss"); Pexa v. Auto Owners Ins. Co.,686 N.W.2d 150, 163 (Iowa 2004) ("The element of loss of use of body is the inability of a particular body part to function in a normal manner. The element of pain and suffering includes bodily discomfort, mental suffering, loss of enjoyment of life, and other emotional distress." (internal citation and quotation marks omitted)). See also Overstreet v. Shoney's, Inc.,4 S.W.3d 694, 715 (Tenn.Ct.App.1999) ("A permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover.... Permanent injury may relate to ... impairment of physical function or loss of the use of a body part[.]").
Because the evidence could have supported a jury award compensating Phillip's estate for the loss of use of Phillip's left leg, this omission likely misled the jury with respect to the question of damages. See Carrington v. Emory,179 N.C.App. 827, 832, 635 S.E.2d 532, 535 (2006) ("When a party makes a correct request for a jury instruction, failure by the trial court to provide the substance of the instruction 'will constitute reversible error.' " (quoting McLain v. Taco Bell Corp.,137 N.C.App. 179, 182, 527 S.E.2d 712, 715 (2000) )). We, therefore, vacate the award of damages and "remand for a new trial only on the question of damages." Alberti v. Manufactured Homes, Inc.,329 N.C. 727, 738, 407 S.E.2d 819, 826 (1991).
PARTIAL SUMMARY JUDGMENT AFFIRMED; PARTIAL NEW TRIAL.
Judges ELMORE and DILLON concur.
Report per Rule 30(e).
Opinion
Appeal by plaintiff from judgment entered 4 March 2014 by Judge Phyllis M. Gorham in New Hanover County Superior Court. Heard in the Court of Appeals 7 April 2015.

Ms. Fields is no relation to Phillip or Gloria.

A prior lawsuit was filed on 9 June 2008. The plaintiffs, Gloria and Phillip, ultimately dismissed the action without prejudice and subsequently timely filed this action. Other details of the procedural history of that initial lawsuit are not relevant to this appeal.